Harris et al. *v.* Galilley, Appellant.

Argued October 29, 1936.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*John L. Pipa, Jr.,* for appellant.

*Fred B. Moser,* for appellees.

OPINION BY STADTFELD, J., January 29, 1937:
This is an action of trespass brought by Herbert

Harris, a minor, and his parents Peter Harris and Catherine Harris, against Stanley Galilley, to recover damages alleged to have been sustained by them. The plaintiffs filed their statement of claim, alleging that on the 19th day of December, 1933, the defendant, Stanley Galilley, was an instructor and principal of the West End High School of Coal Township, Northumberland County, and that Herbert Harris was a student attending this school; that while in the Auditorium, the defendant unlawfully and violently, without any cause, assaulted Herbert Harris by striking him on the back of his head, as a result of which Herbert Harris was permanently injured. The three plaintiffs claimed damages in their respective capacities.

The defendant, Stanley Galilley, filed an affidavit of defense specifically denying any unlawful, malicious or violent conduct on his part, and averring that he stood in "loco parentis" to Herbert Harris and that it was his duty as principal of the school to control the behavior of the pupils.

The case was tried before MORGANROTH, P. J., and a jury, on November 19, 1935. At the conclusion of the defendant's testimony, defendant's counsel presented a point for binding instructions, which was refused. The jury found a verdict in the sum of $721, covering $221 for expenses and $500 compensation.

It was contended upon the trial, by the defendant, that while the students were assembling for Chapel Exercises in the Auditorium he (defendant) was walking down the aisle to assume his usual position to read the Bible and salute the flag. Noticing a general disturbance among the boys created by Herbert Harris in preventing another boy from taking his seat, he stepped in three or four seats, and with the open palm slapped Herbert Harris on the back of his neck, not knowing at the time that it was Herbert Harris. This stopped

the disturbance and he (defendant) walked up to the front of the room and performed his usual duties.

He also contended that there was no malice, ill-will or hatred on his part, but only performed his duty in maintaining discipline by using the usual and customary disciplinary measure.

The minor plaintiff denied that he was in any way responsible for the disturbance or that he participated therein.

Motions for a new trial and for judgment n. o. v. were filed. The motion for a new trial was withdrawn and the motion for judgment n. o. v. was overruled by the court in banc, in an opinion by the trial judge. Judgments were entered on the verdict and thereupon these appeals followed.

The testimony on behalf of plaintiffs tended to establish serious and permanent injuries to the minor plaintiff.

The only assignments of error which are necessary to discuss are the refusal of binding instructions and overruling the motion for judgment non obstante veredicto.

The minor plaintiff's testimony in relation to the alleged disturbance was as follows: "Q. What time did you go into the auditorium that afternoon; to the best of your— A. I imagine it was about five minutes after 1:00 o'clock. Q. How long were you in before Mr. Galilley came in? A. About five minutes. Q. Now, just tell the Court and Jury, please, what Mr. Galilley did, if anything, when he came in? A. I didn't see Mr. Galilley come in. I was sitting there looking up toward the front and Mr. Galilley came in the auditorium and in the center aisle and walked towards the west aisle, and I imagine that is the way he came in. I didn't see him coming. By the Court: Let it be stricken out that he 'imagined'. By the Witness: A. All I know is that I got a wallop back of

the ear. I got dazed for a minute and when I looked back I saw Mr. Galilley there. I didn't say anything. He went down and read the Bible. I waited there until the period was over. Q. Who was sitting next to you? A. George Heath was sitting next to me, and Marion Gessner, his seat was vacant, he sat next to me on the right. Q. What commotion was there that they speak about? A. When Marion Gessner— I got in my seat before he did and he was going to his seat and when he got up to Heath, George Heath was holding him and a boy by the name of George Dietz, and they were holding him and that was the commotion that was going on. Q. Was the place in an uproar or was it just these boys holding Gessner? A. These boys held Gessner. Q. How long were they holding him? A. I would say half a minute. Q. Is that all the difficulty there was? A. That is all." He was corroborated by two fellow pupils, one of whom testified that when appellant struck the minor plaintiff "you could hear it all over the auditorium."

Defendant's testimony in relation to the disturbance was in part as follows: "A. I was on my way down the aisle, shortly after 1:00 o'clock, to take my usual position for reading the Bible and saluting the flag. In passing through the assembly, in the middle division of the assembly, I went to the west side of the building and in passing down along the aisle I noticed a disturbance in among the boys. Looking over I saw the disturbance was caused by two boys, apparently. As I got closer I saw one boy, Marion Gessner, was trying to get to his seat and he was being obstructed by another boy, Herbert Harris, who had his leg or legs between his knees and was preventing him from taking his seat, and creating a general disturbance. Seeing this I felt it was the wrong thing to do. The students had often been warned about creating disturbances. On seeing this disturbance I had to step in, probably

three or four seats. As I recollect Herbert Harris sat in the fifth or sixth seat. They are numbered from '2' to '28', the even numbers on one side. I stepped in two or three seats back of him and with the open palm of my hand slapped him on the back of the neck. After that slap the disturbance subsided and I walked up to the front of the room. Q. When you walked into that aisle did you know who it was that was creating the disturbance, by name? A. I did not. All I saw was the back of his head, and it didn't make any difference who the boy was. Q. And you went and used this disciplinary measure? A. Yes, sir. Q. After that what did you do? A. Walked down to the front of the auditorium and proceeded with my usual duties, which was to read the Bible and salute the Flag, make other announcements and take charge of other activities carried on in chapel exercises."

Appellant contends that the testimony was insufficient to submit the case to a jury, and invokes the protection of the Act of May 18, 1911, P. L. 309, Sec. 1410, and that there is no circumstance in the testimony and none can be gathered therefrom that he acted cruelly, maliciously, unlawfully or with wicked motive.

Plaintiffs, on the other hand, contend that Herbert Harris was not engaged in any disorderly conduct at the time he was assaulted; that whatever "commotion" was created in the auditorium of the High School at the time was the result of the conduct of other boys, and that Herbert Harris had no part therein; that the assault was so severe and violent, and the result thereof was so serious and lasting that the trial court could not say, as a matter of law, that the appellant was within his legal rights when he administered so severe a blow.

The Act of 1911, supra, sec. 1410, provides as follows: "Every teacher in the public schools in this Commonwealth shall have the right to exercise the same

authority as to conduct and behavior over the pupils attending his school, during the time they are in attendance, including the time required in going to and from their homes, as the parents, guardians, or persons in parental relation to such pupils may exercise over them."

The testimony quoted supra, necessarily raised a question of fact which required submission by the court to the jury. This was done under a very fair and comprehensive charge, to which no exception was taken by either side.

The court submitted to the jury the question as to whether or not the appellant abused the right and authority given him by law and the Act of May 18, 1911, P. L. 309, and inflicted unreasonable and malicious punishment, thus making himself liable for the damage and loss the boy and his parents sustained as the result of his injury.

The leading case in this state on the subject matter of this case is *Commonwealth v. Seed,* 5 Clark 78, in which Judge PARSON said, at p. 79: "The right of a parent to correct his minor child, is understood. It is one of the first rules in our domestic relations; and yet is equally clear that the parent may be held responsible for the cruel or barbarous treatment of his child. *The school teacher, while a child is placed by the parent or guardian in school, or under charge of the teacher, is in loco parentis, and can exercise the same authority as the parent,* and is responsible in the same manner, and the rules of law which are applicable to the parental control, are also to be applied to the school teacher, ...... 'The parent has a right to govern his minor child, and as incident to this, he must have power to correct him. The maxim is, that he has power to chastise him moderately. The exercise of this power must be, in a great measure, discretionary. He may so chastise his child as to be liable in an action by the child against

him for a battery. The child has rights which the law will protect against the brutality of a barbarous parent. ...... The true ground on which this ought to be placed, I apprehend is, that the parent ought to be considered as acting in a judicial capacity when he corrects, and, of course, not liable for errors of opinion. And although the punishment should appear to the triers to be unreasonably severe, and in no measure proportioned to the offence, yet if it should also appear that the parent acted conscientiously and from motives of duty, no verdict ought to be found against him.

" 'But when the punishment is, in their opinion, thus unreasonable, and it appears that the parent acted malo animo, from wicked motives, under the influence of an unsocial heart, he ought to be liable to damages. *For error of opinion he ought to be excused, but for malice of heart he must not be shielded from the just claims of the child.* Whether there was malice may be collected from the circumstances attending the punishment. The instrument used, the time when, the place where, the temper of heart exhibited at the time, may all unite in demonstrating what the motives were which influenced the parent. *These observations are equally applicable to the case of a schoolmaster, or to any one who acts in loco parentis.'* Reeves' Domestic Relations 288; 1 Black. Com. 58."

The principle is broadly stated in 24 Ruling Case Law 640, as follows: "The law clothes schoolmasters and teachers with a discretionary power in respect to the infliction of corporal punishment on their pupils. But as a general rule supported by all of the authorities, it may be stated that the punishment must be reasonable and must be confined within the bounds of moderation, that is, it must not be cruel or excessive, and the master must not act wantonly or from malice or passion. ...... and the instrument used must be one suitable and proper for the purpose. ...... (p. 642)

It is always a question of fact, for the jury to determine from all the attending circumstances whether a punishment inflicted was reasonable and proper or excessive. Where a school teacher in attempting to enforce the discipline of his school inflicts a permanent injury and in so doing fails to exercise ordinary care, he will be liable if the injury is the natural and probable result of his negligence."

Under the testimony referred to supra, there were disputed questions of fact, first as to whether the minor plaintiff participated in the disorder or commotion, and secondly, if he did participate, was the punishment excessive or unreasonable under the circumstances. It would have been error to have withdrawn these questions from the consideration of the jury.

After carefully reading the entire record, we see no error which would justify a reversal of the judgments.

The assignments of error are overruled and judgments affirmed.